And if you want to save time for rebuttal, please watch the clock. Thank you and may it please the court. Brian Barron for the appellants. I'm going to try to save five minutes for rebuttal. This case is about stare decisis. This court's decision in California Restaurant Association against Berkeley is directly on point. It held that APCA preempts banning covered appliances directly and that APCA also preempts doing so indirectly by preventing them from using any energy. The district's rule 1146.2. Can I ask you? I'm looking at the language of the CRA decision. It says so as a textual matter, the Natural Gas Act's restriction on FERC authority doesn't conflict with Congress through APCA deciding to supplant building codes that prevent the operation of natural gas appliances. Thus, there's nothing irreconcilable about the scope of APCA's preemption provision in the Natural Gas Act. We see no implied repeal problem because the ordinance doesn't prevent a utility's distribution of natural gas to the meter at new buildings. Rather, it prevents the use of covered appliances by banning piping within the building from a meter to an appliance. So you would agree that this decision didn't address implied repeal when you have two different statutes, correct? That's correct. And I don't think we're arguing that there's any implied repeal here. I don't think the court would need to find an implied repeal of the Clean Air Act to apply the CRA decision to this case. But if APCA prevents jurisdictions from adopting zero emission nitrous oxide standards, then why isn't that an implied partial repeal of the Clean Air Act? It's not an implied repeal because the Clean Air Act already addresses this issue at Section 7410A2E Romanet 1. It says that to get EPA approval of an amendment to a state implementation plan, the state needs to provide assurances that its regulation is not prohibited by any provision of federal or state law. But that's circular, isn't it? It's only prohibited by state law if it's preempted. It doesn't answer the question of whether there's preemption. So that doesn't give me the answer to the question of whether there's preemption. That, to me, is a circular argument. So I think reading them together, they're already in harmony because APCA preempts state regulations of any kind. It doesn't carve out emissions regulations. It doesn't carve out any specific type of regulation. What it does is limit preemption based on the subject matter and regulation concerning, which tells you the scope of preemption around the preempted subject matter. So only when emissions regulations, like any other regulation, are regulations concerning covered appliances, energy use, energy efficiency, or water use, are they preempted. And that's compatible with the Clean Air Act, which is it's not a broad license to do any emissions regulation, no matter whether it runs afoul of any other federal law. Okay. So the preemption provision that's currently in APCA was adopted in 1987. And at that time, the Clean Air Act had already existed for 17 years. And the EPA had already been approving state nitrous oxide emission standards on appliances during that time. So are you saying that the EPA's approval of those standards were all in violations of the law? No, Your Honor. I think the ordinary NOx standards that set a limit that appliances can actually meet are different in kind from a zero NOx standard or, you know, something so close to zero that it is just impossible for a covered appliance to meet that standard. And I think where- And by that, you're going to rely on what? The incidental burden that's in your briefs. Is that correct? That's correct. And I think that- I don't see that in the text of the statute. Is incidental defined anywhere? It comes from the Supreme Court's cases around concerning and relating to preemption provisions. This court held in CRA that this preemption provision should be interpreted in line with those cases that concerning means relating to. And in those cases, the Supreme Court has said that the test for- You're relying on CRA, right? I don't see any Supreme Court cases that have this incidental language. Are you relying on CRA for the- and even incidental- well, why don't you go ahead and answer that question? So- Because I look at the Supreme Court cases and they all say, you know, Dillingham says silence counsels against preemption. Massachusetts v. EPA says EPA's health and welfare authority is wholly independent of another agency's mandate to promote energy efficiency. I mean, I look at Supreme Court cases and I come out the other way. So where is the exact language of this incidental coming from? Is it CRA? I think it's CRA applying the Supreme Court cases. Dan Citi, for example, talks about tangential effects are ordinarily not preempted. I think incidental and tangential are doing the same work. That's at 569 U.S. and 260- Where is incidental in CRA? So I know for sure it's in Judge Baker's concurrence, which I think is- Where is it in the majority opinion? Because that's where it needs to be, right? More than a concurrence? Well, I mean, I think incidental is- I don't have the page number for it right off the- Well, in rebuttal, I'd like you to come back with the page number and tell me where is the incidental language in here and is it defined? Sure, and I will look for that on rebuttal. But I think the broader test from the- Well, let's look at your brief. What do you rely on for your incidental? You must cite something for that proposition, right? I think what we're doing is we are applying the test originally developed for ERISA, which is reference to or connection with, and it asks whether there is a significant impact on the preempted subject matter. I'm looking at your brief where you say, if ordinary limits on nitrous oxide emissions like those already in place in the district have any effect on appliances energy use, that effect is likely incidental. The California Restaurant Association acknowledges much in the Berkeley litigation and you cite CRA decision. So I don't see you citing any Supreme Court decisions for where this concept of incidental is coming from, where it's defined. I don't see that. That's page 50 of your opening brief. I think the CRA decision is throughout. It's applying the Supreme Court precedent on this issue, and that's binding precedent of this circuit. So I think even if the word incidental is only in the CRA decision, and I think if we want to call it tangential, we can get to exactly the same place. The reason a typical emissions regulation is incidental or tangential, rather than having a significant impact on Congress's preemption related objectives, is there is no necessary relationship between satisfying the ordinary emission standards and energy efficiency or energy use. The Neskow brief at 25 to 28 actually has a good illustration of this. It talks about the range of compliance options for NOx standards. So let me ask you, is one parts per million, is that incidental or not? Because your brief seems to say 20 parts per million, that's incidental. So where do you draw the line? Is it at one? Is it at two, three, five, seven? Where is the line for incidental? I think there's a factual question, and we don't have the record here because zero makes that question easy. The point at which an appliance cannot comply, at which you're just regulating the inevitable emissions, rather than setting an emission standard that an appliance can comply with. So something like .0001 BTU per year, or PPM per year or something, that would be effectively zero. So I think you would need, in a case where it's set close to zero, you would need expert testimony to figure out whether that is just an emissions regulation where you can still use covered appliances, or whether that's effectively a proxy for setting a maximum energy use of zero. So for you, if it's set at 20, and that means certain appliances can't be sold, can't be used, because it can't meet that emission standard, that's just incidental? That's right. It's not because of their energy use. It's not because of their energy efficiency. It's because they don't meet the emission standard. And I think the current standard, at least for some of the appliances, is 14. And there's, by the district's own count, there's a million gas appliances that are subject to this rule. So that's, the current standards are in a place where, I'm sure not every gas appliance can comply, but gas appliances can comply, so it's not effectively setting an energy use standard. But based on our decision in California Restaurant Association, it would seem like even a regulation that's set at 20 parts per million would be preempted as well, under the logic of it, because really the opinion was based on the statutory language, which is broad. If you look at face value, no state regulation concerning the energy efficiency, energy use, or water use of such product, covered products, should be effective with respect to such products. If you just look at the language, it is very broad. So putting a limit on 20 parts per million of nitrogen oxide would seem to be regulating the energy use. I don't think it has the connection that's actually required, because you might end up changing the appliance's energy use in going about complying with that kind of standard, but you're not necessarily going to do so. Some methods of complying with NOx standards reduce efficiency, some increase efficiency, so there may be some effects, but they're not even necessarily pointing in one direction. So I think that is tangential to and not a regulation concerning the appliance's energy use, because it's not really getting at what Congress was dealing with in this EPCA provision. But the opinion focuses on the word concerning, saying how broad it is. Everyone knows how broad it is. Congress knows how broad it is. It's a regulation concerning energy use. It may seem to cover that. I think the limiting principle is in Congress's preemption-related intent. So I think Roe is the best case on that. If there's a significant impact on Congress's preemption-related objectives, if it produces the very effect that federal law sought to avoid, that's 552 U.S. at 370 to 372, at that point you're getting into the preempted territory. And the reason the Berkeley regulation did that is because it effectively banned a type of appliance that Congress wanted to preserve consumer choice over and Congress didn't want a patchwork of state and local regulations for, whereas if there's just kind of effects around the margin that might or might not affect energy use or energy efficiency like you get with your typical emissions standard, I don't think that implicates Congress's objective in the same way, and it doesn't. The Berkeley decision focused a lot on how the Berkeley's building code prevented the appliances from using any energy. So they're effectively setting a maximum energy use of zero. I'd like to ‑‑ this is California Restaurant Association's opposition to the motion to dismiss in CRA, and they're also a plaintiff in this case. And I'm just going to read what it says. It says, Berkeley suggests that the ECPA's express preemption provision cannot be interpreted so broadly because the CRA's interpretation would ban all sorts of ordinary local regulations affecting EPCA-covered appliances. Berkeley presents a parade of horribles. What about regulations of nitrogen oxide emissions? What about requiring walk‑in freezers to have multiple exits for safety? But none of these regulations would be barred by the CRA's interpretation of the EPCA. The express preemption clause in the EPCA does not bar all local regulations that affect EPCA-covered appliances. It bars only local regulations that concern energy use. And it says, local regulations requiring extra exits in walk‑in freezers or limiting the emissions of nitrous oxide may affect EPCA-covered appliances, but they do not concern energy use. That's consistent with the line I'm drawing today between ordinary NOx emissions regulations. There was no such thing at the time the CRA said that as a zero NOx regulation. The Bay Area and the South Coast District are the only ones to have adopted such a regulation, and they did so only after that brief was written. But I still don't understand, in this case, what evidence is there that Congress expressed an intent in EPCA to allow partial repeal of the Clean Air Act obligations? So, I don't agree that anything we're arguing for would involve a partial repeal, but I think if the most helpful— The states who are in zones that have requirements to comply with federal air quality standards and risk losing their federal highway funds if they don't come into compliance with those standards cannot regulate nitrogen oxide emissions to come into compliance. That, to me, is a partial repeal, because you're saying they cannot meet their obligations under the Clean Air Act. They can regulate NOx emissions. They cannot effectively ban gas appliances. So, only the subset of regulations that, whether framed as emissions regulations or otherwise, that concern covered appliances energy use are preempted. That's the line Congress drew. But the evidence in the record is they cannot. This district, which includes Los Angeles, Riverside, San Bernardino, the most polluted air in the country, they can't come into compliance without this zero-admission limitation. I mean, I'm looking at the declaration of Sarah Reese, Dr. Sarah Reese. I mean, you're saying, yes, they can come into compliance, but they're saying, no, they cannot come into compliance. This is producing 20 percent of the emissions, these appliance emissions. I think Congress may have set an impossible task. The Public Health Law Center brief at 23 says that, actually, the sources that are beyond the district's control are sufficient to prevent compliance with the federal ozone standards. So, I don't think they can come into compliance either way, and they need to take up with Congress whether they should be punished for Congress giving them too narrow authority to regulate relative to the task Congress has set them. They said the benefit of this rule would be the equivalent of half the amount of nitrogen oxide emissions of all the light-duty cars in the basin, in the LA, Riverside, San Bernardino area. This is a significant amount of emission reduction that would allow them to try to come into compliance with the Clean Air Act. I don't agree that it's particularly significant. I think the numbers are 5.6 tons per day of what this rule, when fully implemented, would reduce, and what they need to do to get into compliance is something like 124 tons per day. So, it's only a slight way toward what they need to accomplish, and the sources over which they don't have control are sufficient to block it. I see my time has expired. Great. I know we asked you a lot of questions, so you can have two minutes for rebuttal. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Matthew Zinn, appearing for the South Coast Air District. I'd like to begin, Your Honors, with a quotation from CRA itself, in which the Court clearly and unambiguously characterized its holding. The Court said, We decide only that EPCA's preemptive scope applies to building codes that regulate the gas usage of covered appliances. CRA does not stand for the sweeping proposition that any regulation that has the effect of preventing the use of a gas appliance is preempted by EPCA. Indeed, the Court pointed out that EPCA would not preempt regulation of natural gas distribution, despite the fact that such regulation could have a massive effect on the use of gas appliances because it could cut off the supply of gas entirely to properties within the jurisdiction. As I asked this of your friend on the other side, but, I mean, if you look at the reasoning and the logic of California Restaurant Association, it's actually quite broad because it's really a very textual argument. Whether it got it right or wrong, you know, people can debate that, but it is what it is, and it's based on the text of the preemption provision, which is very broad, which says, you know, regulating concerning energy use of these products, and this rule here definitely seems to regulate the use of energy use, so why wouldn't it be covered under that preemption clause, under as was interpreted in our decision? Well, your Honor, there is certainly broad language, a lot of broad language. I mean, it's the logic that's based on the text. It's not just the language. It's based on a very textual analysis of what the preemption provision says. It's concerning. It says it's very broad. We all know this. Regulating is very broad. Energy use is very broad, so it falls within it. Absolutely, and yet the Court recognized that the sky is not the limit, using the concerning formulation or the relating to formulation. This presents the curbstone philosopher problem, your Honor, that Justice Scalia pointed out in his concurrence in the Dillingham decision. Everything in the universe is related to everything else, and so courts have to draw a line, a stopping point for that. And in CRA, CRA recognized, again, with natural gas distribution, regulation of natural gas distribution could have a massive, far beyond, massive effect, far beyond the effect of the district's rule here on the use of natural gas appliances. So the language that I quoted from the opinion, I think, is essential to draw that line. The Court didn't need to reach the broader cases than what was before it, which was that Berkeley was regulating the use of gas. And the fact that Berkeley prohibited the use of gas was not determinative, as we argue in our brief. The case is not a gas ban case because Berkeley was regulating energy use. If Berkeley had required the installation of a device that would limit the flow of gas instead of cutting it off completely, the result would surely be exactly the same, right, because Berkeley was regulating the gas use itself. And thus the Court's, I think, quite clear characterization of its holding. Reading again California Restaurant Association, in some ways that was a more difficult case because the Berkeley code didn't mention any specific devices. It was about natural gas infrastructure. So I think all the language about it's a narrow ruling was, well, look, if the rule isn't regulating the covered devices but it's a step above it, infrastructure, is that preempted? And that's a closer question because you can have a very broad law that regulates emissions broadly. And is that preempted? That's a closer question in some ways because the Berkeley code didn't mention anything about covered devices. Here the AQMD's rule directly references these covered appliances. So in some ways it's a clear match between EPCA and the AQMD rules because both are mentioning expressly these devices or appliances. Yes, it does directly regulate the appliances themselves, but it doesn't regulate energy use. And you have to have both for EPCA preemption. The plaintiffs offer- But if it's zero, I mean, you are regulating its use if you can't emit anything. Well, so our position is that the regulation of emissions is qualitatively different from the regulation of energy. Let me explain, if I may. Cutting off the supply of gas to an appliance is inherently regulating the combustion of the gas. It is a logical- the supply of gas is a logical, essential element for the combustion of gas. The regulation of emissions from an appliance is not a logical element of the use of gas. Cars generate all kinds of pollutants in combustion. Many of those pollutants are never emitted because technology is implemented that prevents the emission of those pollutants. The emission is not a logical necessity of the combustion, but supply of gas is a logical necessity of energy use. And that's why Berkeley was- although it chose different means than regulating the appliance directly, it was still clearly regulating the use of energy by cutting off the supply of it. But based on today's technologies, these appliances have to emit nitrogen oxide to operate, right? Yes, today's- well, yes. I mean, I think it all comes down to a question of cost. Virtually anything can be achieved with enough money. But the line drawing that plaintiffs try to do between supposedly ordinary emission limits and the zero limit here, it doesn't function because every emission standard prohibits the use of the appliances that can't comply with that standard. It's inherent in the nature of these standards. And so if the test is whether the regulation prevents the use of a gas appliance, then, as Your Honor suggested, all of these standards must fall. And so does utility distribution. So does zoning regulation, which limits the use of industrial appliances in non-industrial zones. That's why the- I think that's where the CRA's language about narrow probably comes into play. Look, actually, I'm sympathetic with your argument in terms of the scope of the preemption provision. But just under the logic of that decision, and there was an en banc call, and it didn't succeed. So we have that decision, and we have to apply it. And just, again, the reasoning seems pretty broad. And that's what I'm struggling with here. And I just- I don't think I've ever read a case as closely in preparing for- in preparing a case. This case obviously is highly focused on CRA. The court there also seems to be struggling with this- with that- the language in the preemption provision. And the language that I quoted from the decision, I think, is the answer. We are- this case is about the regulation of energy use. That's what Berkeley was doing here. Another distinction I want to get to sort of along the lines of Judge Koh's questioning is the role of the Clean Air Act here. Plaintiffs contend that if emission regulations were intended to be outside the scope of EPCA preemption, then there would be an exemption for that. And I would submit that begs the question completely about whether it's covered by the preemption provision in the first instance. And as we argued in the briefs, the Clean Air- one has to look at EPCA in the context of the preexisting Clean Air Act, a regulatory structure the courts have referred to as one of the most complex structures in the U.S. Code. And the notion that Congress would silently preempt regulations that it had previously intended to foster specifically. I mean, the Clean Air Act has a real sort of sui generis in federal statutes in the sense- in the way that it deputizes states to achieve federal ends. And so I think the question about why Congress in EPCA would carve out this large area of emissions regulation, sub silentio, is really directly presented in this case. It wasn't presented in the Berkeley case. The city of Berkeley was not operating under the Clean Air Act regime in any respect. The district here has been adopting these regulations since the late 1970s. This is simply the latest step in a line of declining standards. This one is zero. But as the CRA court took pains to emphasize, zero is a number like other numbers. It's not qualitatively different. Prior to this lawsuit, has anyone ever tried to challenge the district's emission standards as preempted under EPCA? Not that I'm aware of, Your Honor. And the Bay Area zero emission standard for nitrogen oxide that was enacted in March of 2023, that one also has not been challenged to date. Is that right? That's correct, Your Honor. I want to direct the court's attention to coming back to the idea that there should be an exemption, an express exemption. I want to direct the court's attention to the Dan's City case under the F4A. Why do you think that is? Why do you think the Bay Area zero emission hasn't been challenged in two years and this one has? I would be speculating, Your Honor, except that the district's rules are routinely challenged because, in some ways, as goes the district, so goes the nation. The district, because of its enormous and intractable air quality problems, has had to be an innovator in air quality regulation. And so there are challenges to district rules, even rules that have been in effect for years and been complied with because regulated entities want to avoid the spread of that rule to other parts of the country. But I would be speculating about why. Okay. So it doesn't have anything to do with maybe Central District being a preferred forum than the Northern District or anything like that? I would not speculate about such things, Your Honor, personally. Can you address one that's more of actually a factual question I wasn't certain of when I looked it through the record? I think there's some reference that appliances account for about 20 percent of the nitrogen oxide. And then I think there's something with maybe it was an expert reporter or maybe it was something with AQMD saying without this rule, it can't comply with the Clean Air Act. I mean, 20 percent is a lot, but you still have also the other 80 percent. Why couldn't nitrogen oxide be reduced in the other 80 percent? Oh, it is, Your Honor. The district has countless rules limiting emissions of oxides of nitrogen from the stationary sources that are within its jurisdiction. I guess why couldn't it be reduced even more to try to comply with the clean? I'm just looking at just mathematics. If one thing is only 20 percent, the other is 80 percent, you even take out the 20 percent, you reduce the 20 percent and the 80 percent there. Right, but what I'm suggesting is the 80 percent is already being radically reduced. At this point, the difficulty facing the district is enormous. They need to do absolutely everything in their power to limit NOx emissions. And as plaintiff's counsel pointed out, even then it may not be possible to attain the standards. But the district is obligated to take every step that they can under the authority that they have to do their best to try to attain. The 80 percent, what kinds of things are being regulated in the other 80 percent? Are those cars? Are those? Those are stationary. I'm sorry, so it's 20 percent of the stationary sources. The district lacks authority to regulate mobile sources. State law separates mobile sources. But what are the other 80 percent of stationary sources? What kinds of things are we talking about? Oil refineries and dry cleaners. And there are, I don't know, hundreds of rules, I think, that the district has that regulate emissions from. The difference here from those others in some ways is that this is the classic problem of environmental law, that you have small, diffuse sources of pollution that individually everyone recognizes are not enormous. But taken collectively, have a truly, truly immense impact. If there are no further questions, Your Honor, then we would submit. Thank you. Thank you very much. Thank you. Three quick points. First, Judge Koh, the incidental is not in the majority opinion. But I think 1103 and 1106 to 07 apply the relevant line of Supreme Court cases. Row 552 U.S. at 375 talks about tenuous, remote, and peripheral not being included. And I think that — Incidental is your language then? Because I didn't see incidental in CRA. I've been looking for it, and I can't find it. I think it's our language, probably building on Judge Baker's language. I don't know whether we said it first or Judge Baker said it first, but it's — Judge Baker says it at 1117. But I think it means the same thing as tenuous, remote, peripheral. Second, on the Clean Air Act, the district hasn't identified any provision of the Clean Air Act that would be repealed by applying EPCA preemption here, consistent with the CRA decision. And third, I heard my friend on the other side say that the reason Berkeley's ban regulated energy use was because it was inherently regulating the combustion of the gas and because there was a logical necessity between having the gas supply from the pipes and being able to use gas in the appliance. The same thing is true here. It's undisputed. ER 37, paragraph 3, and FER 7, paragraph 47. Can we say on the implied repeal, let me look at 42 U.S.C. 7502 C1, and it says these are the requirements I believe that districts like the one at issue here would have to implement. It says such plan provision shall provide for the implementation of all reasonably available control measures as expeditiously as practicable, including such reductions in emissions from existing sources in the areas may be obtained through the adoption at a minimum of reasonably available control technology and shall provide for attainment of the national primary ambient air quality standards. So that would be a provision that I would think could be impliedly repealed here because we're saying, no, you can't do that plan, that rule. I see my time has expired. May I briefly answer?  I don't agree that that provision changes 7410A2E Romanet 1, which is that you still have to comply with other federal and state law. So I think the Clean Air Act already reconciles itself with other obligations under federal law when states are pursuing their obligations under the Clean Air Act. We'd ask this court to reverse. Thank you. Thank you. The case is submitted, and you're adjourned for the day. All rise. This court for this session stands adjourned. Thank you.
judges: LEE, KOH, ALBA